**SALISBURY R–IV SCHOOL DISTRICT, Appellant,**

v.

**WESTRAN R–I SCHOOL DISTRICT, Respondent.**

**No. WD 35248.**

Missouri Court of Appeals, Western District.

Dec. 26, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 5, 1985.

Application to Transfer Denied April 2, 1985.

Edward L. Fitzgerald, Downey, Sullivan & Fitzgerald, Kansas City, for appellant.

Robert L. Swearingen, Gary A. Tatlow, Hulen, Hulen, Tatlow & Gump, Moberly, for respondent.

Before DIXON, P.J., and SHANGLER and SOMERVILLE, JJ.

SHANGLER, Judge.

The appeal involves a claim by Salisbury R–IV School District to recover taxes on personal property within its boundary, but erroneously assessed and levied as within the Westran R–I School District and paid to that entity. The suit is against Westran for the money had and received from that levy. The trial court denied the petition.

Salisbury and Westran are duly constituted school districts within Randolph County. The focus of contention is a dragline leased by the Associated Electric Cooperative of Springfield, and physically sited within the Salisbury boundary. The dragline had an assessed value for tax purposes of $2,819,000 on January 1, 1981, and yielded $78,954.40 in revenue for that year. The list of Associated Electric property subject to assessment on that date as submitted by the taxpayer to the Randolph County assessor, however, reported that the dragline was located within the Westran district. The assessor, in turn, entered the dragline in the tax books as located within the Westran borders. The assessor then, by June 1, 1981, delivered the completed tax book to the county clerk. The county clerk, in turn, prepared a Notice of Aggregate Valuation—a list of the composite valuations of all real, personal and other tangible property subject to taxes within a school district—and certified that information to each, Salisbury and Westran. The function of the Notice is to enable a school district [among the other political subdivisions] to fix a property tax levy for the revenues required for its annual budget. [*See* § 164.001 RSMo 1978, as amended.] Thus, the Notice declares only an aggregate valuation, and does not describe the individual properties within each district which compose the valuation. It was on the basis of the Notice that Salisbury fixed a proposed levy of $3.05 per one hundred dollars of property valuation, and Westran a levy of $2.80, in the Estimate of Required Local Taxes submitted to the

county clerk. The levy, as extended on the tax book by the county clerk, estimated a yield of $1,447,524 in local taxes for Westran and $39,168 for Salisbury for budget year 1981–1982. The tax book was delivered by the county clerk to the county collector by November 1 of the year as the law requires, and Associated Electric paid the tax assessed on the dragline, by the Westran levy, $78,954.40, to the assessor on December 30, 1981.

Then, on January 13, 1982, the superintendant of schools, McGuire, of the Salisbury district learned that the dragline was within the boundary of that district, but by error was assessed as property within the Westran district.[1] The next day, McGuire notified the county clerk of the discovery, and she informed him that the dragline tax [$78,954.40] was collected, but not yet disbursed. Salisbury then brought a petition in three counts and joined the judges of the county court, the assessor, the clerk, the treasurer and the collector, all as parties defendant. The counts—for writ of prohibition, for injunction, and for declaratory judgment—sought to prevent the disbursement of the dragline tax revenue to Westran and to adjudicate that Salisbury was the lawful payee of the tax. Westran was joined as a necessary party to the count for declaratory judgment. The court denied the writ of prohibition and the injunction counts. The plaintiff Salisbury requested no order for final judgment as to either count, nor is the propriety of either adjudication a subject on this appeal. The tax money from the dragline was thereupon distributed to Westran. The count for declaratory judgment, still unruled and so pendent, was amended into a claim for money had and received by Westran. The county officials were dismissed as defendants, and the trial was conducted between Salisbury and Westran as the sole principals.

In the rendition of judgment for Westran on the Salisbury claim for money had and

received, the trial court entered findings of fact and conclusions of law. The court adopted the rationale of *Pleasant View Reorganized School District Number 1 v. Springfield Reorganized School District Number 12*, 341 S.W.2d 853 (Mo.1961) to sustain judgment. Salisbury contends that the facts in *Pleasant View* are not comparable, and so the principle of that decision is not an apt precedent.

*Pleasant View*—contrary to contention—posed the same issue of law as confronts us and on a matrix of facts identical in essence. In that case [as here] one school district [Pleasant View] sued to recover taxes paid to another school district [Springfield] upon property erroneously assessed as within Springfield, but actually within the Pleasant View boundary. The court denied the petition for money had and received. The supreme court prefaced exposition of the rationale with the acknowledgement that the remedy asserted by Pleasant View was on a theory in vogue in some jurisdictions, but compatible with neither our statute law, policy, nor judicial precedent.

The plaintiff school district in *Pleasant View* argued as the premise for recovery the reasons given by the majority in *School District No. 8, Shawnee Township, Wyandotte County v. Board of Education of Kansas City*, 115 Kan. 806, 224 P. 892 (1924). That case presented the typical conundrum: the county assessor erroneously listed property as within the taxable situs of one school district—which then imposed a levy on that property and received the taxes collected on the levy—and the school district within which the property was actually sited sued to recover from the recipient school district a sum equal to the amount receivable had its levy been extended against the taxable value of the property. The supreme court of Kansas allowed the cause of action on the premise that [l.c. 894]:

---

1. The dragline, a mobile and massive coal-mining shovel, was not sited in either the Salisbury or Westran school district the year before, and

for that reason Salisbury did not rely on that property for tax revenue in the preparation of the 1981–1982 budget.

For the purpose of maintaining schools the territory of a state is divided into school districts, or their equivalent, and the schools of each district are supported by taxes on the property of that district. In order to enable them to discharge their functions, school districts are constituted quasi municipal corporations, with boards of officers for governing bodies. Each district as a public functionary has a right to receive taxes from the taxable property in its territory. *In this respect districts stand toward each other very much as private proprietors, each of whom is entitled to the revenues from his own domain. If a common overseer make a mistake and place in the treasury of one revenue produced by the property of the other, the estate of the one is benefited at the expense of the other, and the misplaced money is money had and received by one for use and benefit of the other.* [emphasis added]

The dissent refused the analogy drawn by the majority between the school district role as a private proprietor and the taxable property within the district as an owned estate.[2] [l.c. 894]:

*[P]laintiff and defendant are not private corporations.* While they hold title to school sites and schoolhouses, etc., *they do not enjoy the general property rights of natural persons. They are merely legislative agents to receive and disburse what the Legislature provides for them through administration of a taxation scheme by another set of legislative agents. While schools are supported under our system by taxes laid on property within the district, the quasi corporation has no legal right to*

*taxes from such property, as a landowner is entitled to rent of his own land. Taxes are not a part of a school district's estate as rents are part of a landowner's estate,* and we are not warranted in carrying over into the field of school taxes the legal implications from the private property relation. [emphasis added].

The dissent then concluded that, as between such legislative agents, the consequences of an official assessment error—where the budget procedures are otherwise conformed to law—are only benign [l.c. 894]

What happened was this: Plaintiff and defendant in perfect innocence and good faith acted upon the county clerk's certificate of amount of taxable property in its district, made levies according to its need, and received and expended the money. The treasuries of the two taxing bodies were not affected. *Defendant received no money beyond its necessities. It neither levied nor was paid any taxes for use of plaintiff, and it had and received no sum in taxes, which it ought not to have received.* Defendant had no estate which was augmented by what it received. Plaintiff had no estate which was diminished by what defendant received. . . . [emphasis added]

The theory formulated by this dissent— that a school district does not own the taxes from the encompassed territory, but merely administers the legislative scheme which empowers a district to fund the school budget from *taxes imposed on its own estimate and collected from its own levy*—was acknowledged in *Fall River Joint Union High School District v. Shasta Union High School District,* 104 Cal.

---

**2.** The cases on this infrequently-litigated issue, pro and contra, are collected in the early annotation cited by our supreme court in *Pleasant View* [l.c. 855] in 105 A.L.R. 1273, School Funds—Misapportionment—Correction, pp. 276 et seq. (1936). The most recent decisions on the issue, *School District of Gering v. Stannard,* 193 Neb. 624, 228 N.W.2d 600 (1975) and *Fort Wayne Community Schools v. State,* 249 Ind. 562, 233 N.E.2d 636 (1968) follow the *Pleasant View* rationale. Those decisions which come to allow a school district to recover from another school district for property erroneously assessed and taxes collected on that property adopt the private proprietorship analogy [*Shawnee Township* majority], or a theory of trusteeship [*Independent School District v. Common School District,* 56 Idaho 426, 55 P.2d 144 (1936) ], or no theory at all [*Independent School District v. School Township of Washington,* 162 Iowa 42, 143 N.W. 837 (1913) ].

App. 444, 285 P. 1091 (1930) and then more fully developed.

> *Fall River* posed the issue [l.c. 1092]: The question really at issue is whether money received by one district, from lands apparently but not legally within its exterior boundaries, levied and collected for its uses and purposes and devoted to its uses and purposes, can be recovered by a district within whose territory the lands actually lie, *where no levy has been made or taxes collected for its uses and purposes, and where both districts obtained exactly the amount of moneys for which their budget called, and neither district obtained or had the use of money intended for the other.* [emphasis added]

*Fall River* then noted that the California statute [as our own § 164.011] required the board of a school district to submit an annual estimate of the money needed to fund the school budget for the year and that the board of supervisors levy a tax on the property within the district to raise the amount of the estimate, and made response [l.c. 1092]:

> [W]e may state that the complaint fails to show that the plaintiff suffered any deficit in its school funds, or that the defendant obtained any surplus in its school funds by reason of the levy and collection of taxes upon the properties mentioned in the complaint. *The contention [seems] to be based upon the theory that each high school district has an inherent right to all moneys collected by way of taxation upon lands lying within the exterior boundaries of its district, whether or not the levy and collection of such moneys was intended*

*for, or had for its uses and purposes and whether it did or did not receive all the money set forth as necessary in its estimate, and irrespective of whether there was or was not a deficit in its funds, and whether there was or was not a surplus in the funds of the district for which the tax was levied and collected.* [emphasis added]

. . . . .

So far as the complaint is concerned, each district in this action had and enjoyed all the money necessary for its uses and purposes, and no money was paid by mistake to the appellant, derived from taxes levied and collected for the uses and purposes of the plaintiff, as no such taxes were levied or collected.

Our supreme court in *Pleasant View* approved of the dissent in *Shawnee Township* and expressly rested on the *Fall River* rationale to deny the claim of the Pleasant View district for money had and received by the Springfield district from its levy on property erroneously assessed as sited in Springfield, but actually within the Pleasant View territory.[3]

Salisbury contends nevertheless that the *Pleasant View* doctrine, however sound, does not govern the claim for money had and received against Westran. That is because in *Pleasant View* the complainant school district suffered no deficit, and the benefitted district acquired no surplus from the mistaken assessment. The argument cites an excerpt from *Fall River* rescripted in *Pleasant View* [l.c. 859]:

> "[W]e may state that *the complaint fails to show that the plaintiff suffered*

**3.** We add our own parenthesis: The *Pleasant View* adoption of the *Fall River* exposition introduces no new principle into our law, but merely fulfills the augury of this court in *State ex rel. School District v. Beale,* 90 Mo.App. 341 (1901) [also cited in *Fall River* and in *Pleasant View*]. *Beale* was a mandamus by one school district to compel the county clerk to extend its levy over territory in dispute with another school district—and if the tax books had already been delivered to the collector, then that the clerk certify to the collector that the taxes collected were due to the relator district rather than the

district which had imposed the levy. [The courthouse had burned, and the record of the territory boundaries was lost.] The evidence was that the clerk had already extended the tax levied by the respondent school district according to its budget estimate. *Beale* determined that the relator district had no legal right to taxes levied by another district—even though the situs of the property taxed was mistaken [l.c. 344]: "The only taxes which could be legally paid to [a school] district would be *such as that district has estimated or levied.*" [emphasis added]

*any deficit* in its school funds, *or that the defendant obtained any surplus* in its school funds *by reason of the levy* and collection of taxes upon the properties mentioned. . . ."

and then expressly adopted by *Pleasant View* as a premise of decision [l.c. 860]:

We are convinced that the reasoning set forth in the *Beale* and *Fall River* cases, supra, is basically sound and should be accepted as dispositive of this case.

Salisbury argues that contrary to the *Pleasant View* matrix of facts, Salisbury suffered a deficit of $48,167.77, and Westran gained an unanticipated surplus of $173,991.84 from the erroneous assessment—and thus, [we assume] the unjust enrichment premise for the money had and received remedy was proven. The argument rests altogether on a sense accorded to *deficit* and *surplus*, both tendentious and unmeant.

The school district budget process is an inexact practice. That was the acknowledgement of both Superintendant of Schools McGuire of the Salisbury district and Superintendent of Schools Hall of the Westran district. That is because neither the revenues nor the expenditures can be predicted with certainty. The revenues derive from local county, state and federal sources. The local revenues are from the school district levy, and comprise the most significant component of anticipated income. The local revenues also include income from food services, activity fees, and other such miscellaneous sources. Other significant income derives from the short-term investment of tax receipts, but that fluctuates with the current interest rate.

The school district budget extends from July 1 to June 30. The estimated budget must be approved by the board of education before July 1 of the year, and the Estimate of Required Local Taxes [for the local revenue component of the budget]

must be submitted—along with the rate of levy to be extended against the assessed property in the district—to the county clerk by July 15 of the year. The preponderant portion of the taxes, however, are paid to the schools during the early months of the calendar year,[4] so that from July through December [the first half of the budget year, but the last half of the tax revenue income year], a district has less ready money to spend than may be currently owed. That compounds the uncertainty of the budget process. A typical technique a school board employs to allay that possibility of imbalance [the testimony agrees] is to "plan a surplus"—an "end balance to get through from July 1st to the end of the year." Another typical technique is to "plan a deficit"—that is, to forgo an increased levy [and the necessity to submit that proposition to the electorate for approval] and simply to invade the garnered "surplus." Thus, by the time the school budget for fiscal 1981–1982 was formulated, Salisbury had an accumulated carry-over "surplus" of $464,653.99 and Westran, a carryover of $411,861.00.

Salisbury adopted a budget for fiscal 1981–1982 which estimated revenues from all sources at $1,513.300.00 and estimated expenditures for that period of $1,627,-498.00. Thus, the budget anticipated a shortage of $114,198.00. The revenues actually received by Salisbury from all sources for that school year, however, were $1,634,867.67, while the actual expenditures were $1,683,035.57. Thus, Salisbury received $121,567.00 more than the budget estimated was necessary for that school year. Thus, also, the actual shortage incurred was $48,167.77, or $66,030.23 less than anticipated by the budget.

Westran adopted a budget for fiscal 1981–1982 which estimated revenues from all sources at $2,165,215.00 and estimated expenditures for that period at $2,132,-908.00. Thus, the budget anticipated an

**4.** The local taxes—those collected from the levy of the school district as extended by the county clerk over the property assessed for school tax purposes by the assessor—are paid on about January 20 of the year. For that reason, these

tax funds were still undistributed and in the hand of the collector when the assessment error was discovered by Salisbury and then reported to the county officials.

excess of $32,307.00. The revenues actually received by Westran from all sources for that school year, however, were $2,255,121.64, while the actual expenditures were $2,048,822.80. Thus, also, the actual excess incurred was $206,298.48, or $173,991.84 more than anticipated by the budget.

Salisbury argues that this evidence—that Salisbury suffered a deficit in its school funds and that Westran acquired a surplus—differentiates its circumstance from that of the school district suitor in *Pleasant View*—and so sustains a recovery for money had and received.

■ The action for money had and received is a remedy at law governed by equitable principles. *Newco Land Co. v. Martin*, 358 Mo. 99, 213 S.W.2d 504, 510[4] (1948). The action may be maintained whenever one has money in hand which belongs to another, and which, in equity and good conscience the other should pay over. *Brandkamp v. Chapin*, 473 S.W.2d 786, 788[1, 2] (Mo.App.1971). The remedy is based on a promise implied by law, or on the principle of equity that a person unjustly enriched at the expense of another must make restitution. *Eichenberg v. Magidson's Estate*, 170 S.W.2d 105, 108[1–6] (Mo. App.1943); 58 C.J.S. *Money Received* § 1 (1948). An action strictly at law does not avail Salisbury to regain the tax money paid to Westran for the simple reason that a school district may claim as of right only taxes collected from a levy the district itself imposed. That public policy of the school tax scheme was discerned early in *State ex rel. School District v. Beale*, 90 Mo.App. 341 (1901), and was the confirmed in *Pleasant View*, l.c. 859. The principle of *Beale* that [l.c. 344]: "The only taxes which could legally be paid to [a school] district, would be such as that district estimated or levied"—was reaffirmed in *Pleasant View* [l.c. 858 et seq.] as the public policy of then §§ 165.077 and 165.083 [now §§ 164.011 and 164.041]. The only persons with a direct interest in the revenues paid because of the erroneous assessment—and so with even colorable status to sue at law—are

the taxpayers of the affected school district, and they are not before the court. *Pleasant View*, supra, l.c. 860; *Fall River*, supra, l.c. 1095; *Fort Wayne Community Schools v. State ex rel. New Haven Public Schools*, 249 Ind. 562, 233 N.E.2d 636, 641[6] (1968). Thus, to state a claim at all, Salisbury must demonstrate some equity, some claim to restitution, which supervenes the *Beale* and *Pleasant View* stricture and the public policy it protects. Restatement of Restitution § 62, Transferee Protected by Public Policy (1937) [Missouri Annotations, cases cited pp. 72 et seq. (1944)].

■ An action for money had and received, as we note, is a species of restitution. It postulates that the defendant was unjustly enriched at the expense of the suitor, and so in equity should be made to pay over. In the context of a claim for money had and received to redress the unjust enrichment of one school district at the expense of the other, *Pleasant View* [l.c. 859] articulates that the proof must demonstrate, at the very least, *that the suitor district received less than its estimate for the needs of the year—and in that sense suffered a deficit*. The proof was quite to the contrary. *Salisbury* budgeted a shortage of $114,198.00, but received $121,567.00 more than the budget estimated was needed to meet the anticipated expenditures. Thus, by any concept of fiscal management, Salisbury suffered neither shortage nor "deficit" for year 1981–1982. Salisbury claims, nevertheless, a "deficit" for that year of $48,167.77. That conclusion is premised on *the difference between the revenues actually received and the expenditures incurred for 1981–1982*. Thus, although the budget estimated $1,627,498.00 as the expenditure needed for the year, the school district actually spent $1,683,035.57 for the year—or $55,537.57 more than the estimate—[from funds, we surmise, earned from the unexpected boon of a 20.5% interest return on invested tax revenues]. A school budget, however, comes as an estimate, and as an *estimate* determines the money needed from taxes for that year, and as an *estimate* is extend-

ed as a levy against the taxable property in the district. §§ 164.011 and 164.041. The principle of *Pleasant View*—that an action by one school district for money had and received by another must show, at the least, that the suitor district received less than the *budget estimate* as a result of the assessment error—merely implements that public policy. *Pleasant View*, supra, l.c. 854; *Beale*, supra, l.c. 344. Thus, the sums a school district actually spends during the fiscal year is irrelevant on the question of a budget in deficit which, by implicit scheme of statute, is constructed in terms of estimate. The evidence proves no unjust enrichment of Westran at the expense of Salisbury. That Westran also enjoyed a surplus does not prove an equity for restitution under *Pleasant View*, because that carryover was not at the expense of Salisbury—which itself enjoyed an absolute surplus of revenues above estimated expenditures for that year—so that at the end of budget year 1981—1982 Salisbury still owned an accumulated surplus of $416,486.22 from prior budgets.

Salisbury argues, nevertheless, that had it known the dragline was subject to taxation, Salisbury would have used that revenue to support the 1981–1982 school year and so, we assume, not have submitted an estimated shortage. The Salisbury argument merely reverts to the notion that a school district stands as a proprietor, rather than as an agent of the legislature, as to the tax revenues from that territory. Our public policy repudiates that concept, as *Pleasant View* expressly and *Beale* implicitly decide. The shortage estimated for the Salisbury 1981–1982 budget, and then extended as a levy on the tax books, was [in the words of Salisbury School Board President Pressley] a "planned deficit." It was prompted, among other considerations, by the political decision to avoid submission of an increased levy to the electorate. In that sense the "deficit" was a contrivance of choice. It was a customary practice, moreover, to "plan a deficit" as well as to "plan a surplus," as prudent management dictated. That was the concurrence of all the administrators. There may be less reason to suppose that with the additional revenue from the dragline assured, Salisbury would have estimated a budget in imbalance, but from past practice, the contrary was not forgone. The argument is, in any event, irrelevant simply because on any terms Salisbury received at least all the budget estimated was necessary for the 1981–1982 school year, and no deficit, and hence no cause of action for money had and received was proven.

Salisbury argues next that its claim rests on facts distinguishable from those in *Pleasant View* because that petition was for recovery of taxes paid in years past, whereas in the Salisbury claim, the school year was still in progress when its district superintendent McGuire discovered the location error of the dragline. Salisbury argues also that at the time McGuire notified the county officials of the mistake, the tax money from the Westran levy on that property, although already collected was not yet disbursed. Salisbury argues further that the money was still not disbursed when its petition for prohibition, injunction and declaratory judgment against the county officials was filed. Salisbury concludes that these circumstances present a different issue from that decided in *Pleasant View* because there the funds were years since distributed and spent, whereas at the time Salisbury brought suit, the funds remained intact with the county treasurer. Salisbury suggests that we apply the solution adopted in *Mabelvale Special School District v. Halstead Special School District*, 276 S.W. 684 (Ark.1925) to determine that, as to funds not yet distributed but still in dispute, an action at law lies by a school district to recover money mistakenly assessed and paid to the other.

In that case the Supreme Court of Arkansas was confronted with an action at law by one school district to recover taxes paid to another on lands each claimed was encompassed within its territory. The court concluded [l.c. 585] that as to taxes which have been "regularly, though erroneously, distributed to [a] school district and

consumed in educational purposes," no action lies, but "as to taxes in the hands of the treasurer at the time [the] suit was commenced," an action lies.

That very question, however, was the issue presented to the trial court by the counts for prohibition, injunction and declaratory judgment, adjudicated against the Salisbury contention and allowed to lapse. The prohibition and injunction counts were not appealed, and so are not before us. The county treasurer and other officials are not before us and, indeed, the tax money has already been distributed to Westran. The only claim for review is the count originally for declaratory judgment but amended into a claim for money had and received.

There is another reason the Arkansas solution is not an apt remedy. A school district has no status to sue at law to recover money from another school district for taxes received under the circumstances described in *Mabelvale.* If such an action lies at all, it belongs to those directly affected by the fiscal error—the taxpayers of the affected district. A school district is not a trustee for the taxpayers; they stand in their own right. *Pleasant View,* supra, l.c. 860; *Fall River,* supra, l.c. 1094. Those taxpayers are not before the court.

Salisbury next cavils at some of the terminology used by the trial judge in the findings prefatory to judgment. We sustain the judgment because it is right. Our discussion suffices as a full review of the decision of the court and of the issues preserved and presented for appeal. The decisions from other jurisdictions Salisbury cites on this and other points rest on rationales contradictory or indifferent to the principles pronounced by our supreme court in *Pleasant View* and of this court in *Beale,* and so do not bear as precedents.

The judgment is affirmed.

All concur.